# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

**v.**                                    **Case No. 3:00cr48/LC/CJK**
                                    **3:09cv129/LC/CJK**

**JERROLD L. GUNN,**
**Defendant**.

---

## REPORT AND RECOMMENDATION

This matter is before the court upon defendant's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (doc. 1718). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). Having conducted a careful review of the record and the arguments presented, the undersigned concludes that the motion should be denied.

### FACTUAL & PROCEDURAL BACKGROUND

The defendant, Jerrold L. Gunn, was charged with conspiring to commit wire and securities fraud, in violation of 18 U.S.C. § 371, and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) (docs. 966, 1662). Defendant was also charged with violating 18 U.S.C. § 1957, or conspiring to engage in monetary transactions that the defendant knew involved criminally derived property, where the property had a value greater than $10,000, and where the property was derived from wire fraud (docs. 966, 1644, 1645, 1662).

Defendant's conviction stems from his apparent involvement in a complex high-yield trading scheme known as the Hammersmith program. *See United States v. McCrimmon*, 362 F.3d 725, 727 (11th Cir. 2004). Hammersmith, created by David Gilliland, appeared to be an exclusive investor's club designed to yield high returns for those individuals who invested the minimum amount. *See id.* In late 1997, Gilliland opened a Hammersmith investment "branch," known as Bridgeport Alliance, in Bluewater Bay, Florida. *See id.* Bridgeport served as an administrative office for Hammersmith, but its staff also marketed the program to prospective investors under the pretense that they could buy into the scheme for a mere $250,000. *See id.*

"The key selling point of the Hammersmith program was the apparent 'security' of the investment, as it was supposedly collateralized in a U.S. Treasury Bill." *Id.* Hammersmith represented to investors that the Treasury Bill, once purchased, "would be leveraged in investments such as the European currency market to generate high returns for little risk." *Id.* In actuality, Hammersmith was not an investment program, but rather a Ponzi scheme in which investors' principle was laundered through various bank accounts, paid out to other investors as interest payments, and "ultimately accumulated in the pockets of Gilliland and his crew." *See id.* at 728. All told, the Hammersmith co-conspirators persuaded investors from across the United States to part with more than $60 million before the program collapsed in early 1999. *See id.* The perpetrators retained approximately $27 million in criminal profits (doc. 1616).

Defendant's involvement in the enterprise was that of a contract drafter, compliance officer, and general legal advisor. Bridgeport recruited and screened

potential investors to fund the trading program.  Once an individual or entity engaged in the program as an investor and/or agent, William H. West and Kenneth B. Cobb, both co-conspirators in the investment scheme, facilitated the execution of a number of documents on behalf of Bridgeport.  These documents, drafted largely by Mr. Gunn, included Bridgeport client agreements, Hammersmith Trust loan agreements, and declarations  of trust, all of which obligated the program managers to invest the funds in legitimate trading programs.  Defendant ultimately wrote and approved a vast majority of the financial contracts for the putative investment program, and also created the various safety net tools utilized to assure investors that the program was secure.

A large portion of the invested funds went into multiple bank accounts and from there to co-conspirators.  The trading program was furthered by the purchase of one bank in particular, American Pacific Bank and Trust, Inc. (AMPAC), which was created in part by David M. Bishara to assist in the scheme's movement of investor funds offshore.  In fact, AMPAC was merely an account at the Bank of Bermuda, which the co-conspirators used to disburse much of the investors' monies to other countries.  According to IRS special agent Tracy Preisser, defendant was instrumental in helping Bishara to acquire the AMPAC charter and organizing the offshore account (doc. 1616, pp. 8-9, 14).

Defendant, a citizen of Canada, was indicted on June 21, 2000 (doc. 1), and arrested on an extradition warrant on July 31, 2003 (doc. 1616).  Defendant was released on bond in Canada and contested his extradition to the United States through July 19, 2007, when defendant waived a final appeal to the Supreme Court of Canada of an adverse extradition decision and surrendered to Canadian authorities (doc.

1616).  This court conducted an initial appearance hearing on August 31, 2007 (doc.1596), and set the case for trial on November 5, 2007 (doc. 1603).

At a detention hearing on September 6, 2007, defendant testified that in 2000 he learned of the indictment against him, but that he did not waive extradition to the United States to answer the charges (doc. 1616).  Defendant explained that he did not waive extradition because his mother-in-law, who passed away in December 2000, was dying at the time (doc. 1616).  After his mother-in-law's death, however, defendant continued to contest his extradition.  He provided three reasons for the continued fight:  (1) his wife was emotionally distraught over her mother's death, (2) his wife had leukemia, and (3) his brother-in-law was contesting the mother-in-law's will (doc. 1616).  Defendant ultimately acquiesced in extradition in 2007, asserting he then believed his wife's health had improved (doc. 1616).

The government argued, *inter alia*, that defendant's considerable efforts fighting extradition warranted an order of detention pending trial (doc. 1616). Defense counsel responded, "There is nothing that I know of that's illegal about fighting extradition, you know, I would certainly, as I think any competent attorney would do, advise him to do so" (doc. 1616).  Defense counsel also moved for a continuance, asserting that he would require additional time to review the extensive discovery provided and made available to defendant in this case (doc. 1616). Defendant again moved for a continuance on October 17, 2007, arguing the same grounds (doc. 1607).  The District Court granted the motion to continue and set trial for January 7, 2008 (doc. 1610).  Defendant filed speedy trial waivers on October 17 and 25, 2007, each signed by both defendant and his attorney, E. Brian Lang (docs. 1608-09).

A jury convicted defendant of conspiring to commit wire and securities fraud (count I), conspiring to commit money laundering and engaging in prohibited monetary transactions from criminally derived property (count II) (doc. 1662).  The District Court sentenced defendant to 60 months in prison as to count I and 91 months in prison as to count II, the terms to run consecutively (doc. 1662).  Defendant appealed the District Court's judgment and sentence, but then filed a motion to dismiss his appeal, which the Court of Appeals granted (docs. 1664, 1674).

In the present petition filed pursuant to 28 U.S.C. § 2255, defendant alleges three grounds he believes require that his conviction and sentence be vacated or modified.   Defendant asserts (1) the evidence was insufficient to establish he conspired to launder criminal proceeds; (2) the sentence should have been calculated only in consideration of the profits derived from the criminal scheme; and (3) that defense counsel was ineffective for failing to allege a violation of defendant's speedy trial rights (doc. 1718).  Defendant requests that the convictions be vacated or, in the alternative, that the conviction for money laundering be set aside or, in the alternative, that the  sentence for money laundering be adjusted downwards (doc. 1718).

## ANALYSIS

As a preliminary matter, the undersigned notes certain general rules applicable in section 2255 proceedings following direct appeals, as well as the distinction between review under section 2255 and direct appeal.  "Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a § 2255 proceeding." *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994).  "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further

factual development." *Id.* "A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal." *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001). "Further, a § 2255 movant cannot argue as the causal basis for his failure to advance an argument on direct appeal that the argument only became known to the movant due to subsequent developments in the law." *Castro v. United States*, 248 F. Supp. 2d 1170, 1174 (S.D. Fla. 2003) (citing *McCoy*, 266 F.3d at 1258).

Regarding the important difference between a section 2255 collateral challenge and direct review, "[i]t has long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio*, 442 U.S. 178, 184 (1979). Relief should be granted only if the challenged sentence resulted from "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *See Hill v. United States*, 368 U.S. 424, 428 (1962).

Defendant argues first that his conviction for conspiring to launder money must be vacated in light of *United States v. Santos*, a case defendant believes holds that transactions involving the payment of expenses connected with criminal activity–as opposed to profits–do not violate federal money laundering statutes. *See* 553 U.S. 507, 509-14 (2008). Defendant contends that the government failed to present evidence that he laundered criminal profits, but instead proved only that he received fees for services provided in furtherance of the criminal activity.

Gunn simply misreads the holding of *Santos*, which is especially restrictive in scope. "The narrow holding in *Santos*, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956 . . . ." *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009). Similarly, in *King v. Keller*, the Eleventh Circuit held that *Santos* did not apply where the defendant's "money laundering convictions were based on his participation in 'a cash rental 'ponzi scheme' and a related treasury bill leasing program.'" *See* 372 F. App'x 70, 73 (11th Cir. 2010). One finds no paucity of other cases that have rejected the application of the *Santos* profits test to money laundering offenses stemming from crimes other than gambling. *See*, *e.g.*, *United States v. Jennings*, 599 F.3d 1241, 1252 (11th Cir. 2010) (rejecting defendant's claim that, because the government failed to prove money at issue was *profits* of illegal activity, he could not be convicted of money laundering in connection with fraud and conspiracy convictions arising from scheme to sell fraudulent workers' compensation insurance); *Mignott v. United States*, Nos. 09-60805-CIV, 04-60186-CR-UNGARO, 2010 WL 2035105, at *8 (S.D. Fla. May 3, 2010) (denying relief "because the limited holding in *Santos* does not apply to Mignott's conviction for conspiring to launder money which is the proceeds of Medicare fraud"); *United States v. Morris*, No. 6:09-16-S-DCR, 2010 WL 1049936 (E.D. Ky. Mar. 19, 2010) (holding *Santos* inapplicable where the predicate offenses were bribery and extortion); *United States v. Poulin*, 690 F. Supp. 2d 415 (E.D. Va. 2010) (holding that *Santos* does not apply to health care fraud offenses); *Arnaiz v. Hickey*, No. CV208-97, 2009 WL 2971638, *3 (S.D. Ga. Sept. 16, 2009) (limiting *Santos* to gambling cases and declining to apply profits test where the offense involves laundering of receipts of Medicare fraud); *United States v.*

*Prince*, 627 F. Supp. 2d 863, 868-72 (W.D. Tenn. 2008) (limiting *Santos* to gambling cases and declining to apply profits test where the offense involves laundering of receipts of health care fraud).  Because defendant is not accused of laundering gross receipts derived from an unlicensed gambling operation, *Santos* is unavailing in this instance.  *See Demarest*, 570 F.3d at 1242.

Assuming that the foregoing cases are just wrong and *Santos* might be read more generally to hold that the gross receipts of any criminal activity are not "proceeds" under section 1956, the result does not change.  Section 1956  prohibits the use of the proceeds of criminal activities for various purposes, including engaging in, and conspiring to engage in, transactions intended to promote the carrying on of unlawful activity:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(I).  Even under this more generalized reading, *Santos* will not aid Mr. Gunn.   Here, the government presented substantial evidence that defendant lent his assistance to a Ponzi scheme by helping to establish a bank account into which profits from the scheme were deposited and disbursed overseas (doc. 1616, pp. 10, 14).

Assuming further that *Santos* could be properly applied to support relief, I find that defendant failed to raise the *Santos* claims on direct appeal.  As a result, the claims are now procedurally barred.  *See United States v. Nyhuis*, 211 F.3d 1340,

1343-44 (11th Cir. 2000) (requiring defendant seeking to raise issue on motion for collateral relief to show "cause excusing his failure to raise the issue previously and actual prejudice resulting from the alleged error"); *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989) (requiring that "a defendant . . . assert an available challenge to a sentence on direct appeal or be barred from raising the challenge in a section 2255 proceeding").   Mr. Gunn's argument would have this court treat his habeas petition as a substitute for, or the equivalent of, a direct appeal.  Such is clearly not a permissible use of a section 2255 petition. *See Larson v. United States*, 275 F.2d 673, 677 (5th Cir. 1960) ("'It is elementary that neither habeas corpus nor motion in the nature of application for writ of error coram nobis can be availed of in lieu of writ of error or appeal, to correct errors committed in the course of a trial, even though such errors relate to constitutional rights.'" (quoting *Howell v. United States*, 172 F.2d 213, 215 (4th Cir. 1949))).[1]

Defendant argues next that his sentence should have been calculated only in consideration of the profits derived from the criminal scheme.  Defendant theorizes that after *Santos*, enhancements to a sentence based on the total amount of money transactions conducted by the principal defendant must be vacated.  As already explained, defendant has failed to establish the applicability of the *Santos* holding to this case.  Even ignoring the clear precedent laid down by the cases explaining and limiting the applicability of *Santos*, I would not conclude that *Santos* provides defendant an engine for relief on this argument, where the government charged

---

[1] In *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

defendant with violating 18 U.S.C. § 1957 (doc. 766).  Section 1957(a) makes it a criminal offense to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and [which] is derived from specified unlawful activity . . . ."  The *Santos* holding regards section 1956, which requires the government to establish that the defendant used the "proceeds" of unlawful activity to promote the carrying out of the activity.  Section 1957, on the other hand, has no similar element.  As a result, *Santos* would not have prevented the sentencing court from taking into account gross receipts generated by the criminal activity.

For his final point, defendant contends that defense counsel was ineffective for failing to allege a speedy trial right violation . (doc. 1718).  "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's performance was deficient[,]" which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense[,]" which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

Constitutional speedy trial challenges are subject to a four-factor test.  *See Barker v. Wingo*, 407 U.S. 514, 530 (1972) (denying relief to habeas corpus petitioner raising speedy trial grounds).  The four factors are "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Id.* "The length of the delay is to some extent a triggering mechanism."  *Id.*  "Until there

is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* "Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (applying *Barker* criteria to defendant's claim on appeal).

The speedy trial clock begins to run when an individual is indicted or arrested and made to answer to a criminal charge. *See Dillingham v. United States*, 423 U.S. 64, 65 (1975) ("[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."); *United States v. Reme*, 738 F.2d 1156, 1162 (11 Cir. 1984) ("The protections of the Sixth Amendment are activated 'only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution.'" (quoting *United States v. Marion*, 404 U.S. 307, 313 (1971))).

Here, the government indicted Gunn in June 2000, but did not attempt to extradite him from Canada until July 2003 (docs. 1, 1616). Defendant, having satisfied the first of the speedy trial considerations articulated by the Supreme Court, "retains the burden of proving the remaining factors under *Barker*." *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) (reviewing government's appeal of district court's dismissal of federal indictment returned against defendant). The second *Barker* factor requires the court to examine the government's reason for the delay. *See* 407 U.S. at 530. Between the time of defendant's indictment and the government's first attempts at extradition, the government forewent Gunn's prosecution, opting to advance charges leveled against co-conspirators involved in

the scheme.  The undersigned agrees with the government, however, that the government's election was not the sole cause of delay in this case.  Gunn testified that he contested his extradition from Canada for a variety of personal reasons, including multiple family illnesses (doc. 1616).  Far from vigorously pursuing a speedy hearing, defendant, indicted in 2000, did not waive extradition to the United States until 2007 (doc. 1616).  In other words, the delay in defendant's trial cannot be attributed to prosecutorial negligence or bad faith alone.

The third factor of the *Barker* balancing test weighs the defendant's assertion of the right to speedy trial.  *See* 407 U.S. at 530.  Here, defendant did not assert the right at all, opting instead, as his litigation strategy, to challenge extradition from Canada.  Defendant, once in custody in the United States, filed speedy trial waivers in October 2007, and then moved to continue the trial to allow defense counsel additional time to review the considerable volume of discovery provided in connection with this matter (docs. 1607-10, 1616).  Mr. Gunn not only refrained from asserting any right to speedy trial, but actively waived the right and subsequently delayed prosecution further by his own motion.  The government may not be charged with such delay.  *See United States v. Hill*, 622 F.2d 900, 909 (5th Cir. 1980) ("Any prolongation attributable to conduct by the accused is excused.").

The final *Barker* factor examines prejudice to the defendant.  *See* 407 U.S. at 530.  Prejudice can be established in three ways: (1) oppressive pretrial incarceration; (2) anxiety and concern caused to the accused; and (3) the possibility that the accused's defense will be impaired.  *See Clark*, 83 F.3d at 1354.  Only the third form of prejudice is implicated here, as defendant was not incarcerated during the delay in prosecution and does not allege anxiety or concern.  Rather, defendant contends

generally that "the failure of the Government to proceed expeditiously caused severe prejudice to the Petitioner and the Petitioner suffered as a result" (doc. 1718). Defendant, citing the testimony of multiple witnesses at trial, argues further that but for the pretrial delay "the memory of witnesses would not have failed and a more truthful case would have been put to the jury" (doc. 1720).

Though acknowledging the most serious prejudice is the third form, the possibility that the accused's defense will be impaired, *see Hill*, 622 F.2d at 910, the courts of this circuit have "consistently held that conclusory allegations of prejudice, including unsubstantiated allegations of witness's faded memories, are insufficient to constitute proof of actual prejudice.*" See, e.g., United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1994). Here, defendant contends that the faulty memories of various co-conspirators prejudiced his defense. Specifically, defendant alleges that Gilliland, the main co-defendant, admitted that his memory had been compromised by the passage of years (doc. 1720). In reviewing the transcript of defendant's trial, the undersigned notes that Gilliland simply conceded to having less-than-perfect memory regarding some of the events underlying the Ponzi scheme for which defendant was on trial. When, for example, Gilliland could not say with certainty whether defendant had been present at a January 24, 1997, meeting between Gilliland and Frank Scott, defense counsel asked, "Then your memory is not that good about things that happened almost 10 years ago, correct?" Gilliland responded, "On some of them. On some of them, it's better" (doc. 1712, p. 915).

Defendant makes similar allegations regarding the testimonies of co-defendant Cobb and Scott, a witness for the government (doc. 1720). The transcript, however, reveals that neither witness testified to an impaired memory regarding a material fact

in issue.  Cobb, for instance, when presented with a letter in which defendant rejected a prospective client's investment application, responded that he could not remember whether any additional such documents existed (doc. 1709).  The witness' powers of recall notwithstanding, the undersigned finds the relation between defendant's allegations of impaired memory and the material facts in issue too tenuous to be recognized as a source of prejudice.  *See United States v. Dennard*, 722 F.2d 1510, 1513-14 (11th Cir. 1984) ("[W]here . . . appellants allege no more than the general inability to recall a transaction with desired specificity that occurs in any trial regardless of delay, and where such faded memories do not appear substantially to relate to any material fact in issue, no actual impairment of their defense for purposes of a speedy trial challenge is shown." (quoting *United States v. Avalos*, 541 F.2d 1100, 1116 (5th Cir. 1976))).  One of the very purposes of cross-examination being to expose the fallibility of memory, defendant must show more than the sort of ordinary forgetfulness that would have attended his trial had he been prosecuted in strict accordance with speedy trial procedures.  *See, e.g., Davis v. Alaska*, 415 U.S. 308, 316 (1974) (observing that cross-examination serves to reveal a witness's perceptions and memory); *United States v. Williams*, 592 F.2d 1277 (11th Cir. 1979) (stressing "the importance of the right of cross-examination to delve into a witness' story, to test the witness' perceptions and memory and also to impeach the witness").

Defendant's motion and supporting memorandum consist primarily of conclusory allegations of prejudice, which, as explained, do not establish that defendant suffered actual prejudice from the pretrial delay in prosecution.  *See Hayes*, 40 F.3d at 366.  As no one *Barker* factor predominates, the factors must be balanced against one another in the context of surrounding circumstances.  *See Dennard*, 722

F.2d at 1512-13 ("We regard none of the four factors . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."). Finding precious little conduct consistent with assertion of the right to speedy trial nor any objective prejudice resulting from delay, the undersigned cannot rationally find that defense counsel could have successfully established a violation of defendant's right to speedy trial.  Counsel does not render ineffective assistance for failing to argue a meritless claim.  *See Shere v. Secy, Fla. Dep't of Corr.*, 537 F.3d 1304, 1311 (11th Cir. 2008) (agreeing that "appellate counsel is not ineffective for failing to raise a meritless issue on appeal"); *Ladd v. Jones*, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them.").  The undersigned cannot find that defendant's counsel was ineffective for failing to allege a meritless claim of violation of speedy trial rights. *See Strickland*, 466 U.S. at 687 (conditioning successful ineffective assistance of counsel claim on showing that counsel's performance was deficient).  For these reasons, defendant fails to establish any basis upon which relief can be granted.

Accordingly, it is respectfully RECOMMENDED:

The motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (doc. 1718) be DENIED.

At Pensacola, Florida, this 13th day of June, 2011.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**